Good morning ladies and gentlemen. Welcome to the 5th Circuit Court of Appeals. We have four cases to be submitted today on oral argument. We'll hear the first two and then take a brief recess and then finish for the day. And we begin with United States v. Arrieta. Ms. Stilling. May it please the court, counsel. As the court is aware, there is extremely little law on mutiny and the nature of the charge of mutiny in this circuit or any other circuit, much less any law on the application of sentencing guidelines in mutiny cases. In this case, my client was among a group of six people who protested at an immigration detention center. Their protest was to climb up on a roof of a recreation area and say that they wanted to speak to the press or they wanted to speak to somebody in Washington. Their complaint was that they had been sitting waiting for deportation too long. They also had some other complaints about conditions, but that was their primary complaint is that they had been ordered deported months prior and they were just sitting there in detention. Because there's so little law on the nature of mutiny, there were actually very vigorous probable cause arguments made even at the probable cause hearing because it was a basically a peaceful protest. And when I say basically, I shouldn't say basically. It was a peaceful protest. The only violence alleged was that they threatened to throw themselves off of the roof. This was a case that almost went to trial. So does this come down to what is meant by a major disruption? It does, your honor. Yes, it does. And the only reason I'm pointing out the nature of the offense because what I'm going to get to is that this was like the least activity that could qualify as a mutiny. And so that's why my argument is it should be the lowest guideline level in the mutiny guidelines. So with respect to the sentencing guidelines, your honor, I think it's helpful to recognize that this is not a scale in the guidelines. There's three different guideline options. A 22 if there is a risk of serious bodily injury or death. It is a 16 if there is a major disruption to the functioning of the institution. And it is a 10 if it is otherwise. And so basically plain vanilla mutiny. And the reason I point out it is not a scale because so many of the guidelines are scales that like an assault guideline. It's a one level if it's a touching. It's another level if it's bodily injury. It's another level if it's serious bodily injury. Other guidelines are on scales of money or scales of drugs. This is not a scale. The guidelines address different aspects of the offense. So the upward, not to a degree. And the reason I make this point is that the government was arguing for a level 22 and the probation department actually in the PSR found a level 22 which they found a risk of serious injury or death. The risk they were identifying is that the defendants were threatening to throw themselves off of the roof. You do agree we're reviewing the district court finding for clear error. You disagree with that? I think it's abusive discretion. Her factual findings. Well, no I'm not sure that I agree with that, your honor. And here's why I believe it's an abrusive discretion, your honor, is that the court basically made no factual findings. She just said I disagree with this. The government was arguing for a 22 based on violence basically. I was arguing for a level 10 which was the other. And she went in the middle which is the level 16 for major disturbance or disruption. I'm sorry, not disturbance, disruption. There were no arguments that the U.S. attorney made or the probation officer made as to why there was a major disruption. So there aren't even any implied factual findings. The judge just said I'm going in the middle here. So those adjustments address different concerns. I think the government argues many things that were bad about this, that they planned this. The six defendants, they planned this protest. They put shirts over their faces to disguise themselves. What is a workable definition of major disruption? A workable definition of major disruption would be... Does it require violence? No, I don't think it requires violence, absolutely not. Does it require property damage? I think that would be so. I think it's something that disrupts more than a temporary halt to administrative services, yes. Six hours temporary? Yes. Really? I think so, yes. And this is why I don't think it involves violence. I thought, for instance, if somebody clogged all the toilets, if there was a movement that all the inmates in a wing were going to clog their toilets at once, that would be a major disruption, a completely nonviolent but major disruption. It probably would require evacuation of inmates. It would require plumbers to come. It might require hours or days to fix. Does it turn on the detainee's conduct? Does it turn on the institution's response? Well, I think both, actually. It does turn on what happens rather than what the intent is that goes into it or the planning. It does turn on the results, but an administrative... Institutions often lock down for different reasons. They lock down when there's measles. They lock down when the electricity is down, the water is down. They lock down when they're doing repairs to the rec yard. Those kinds of lockdowns, I think, are administrative. They're not locking down because they need to... I mean, this happened in the rec yard. It did not happen indoors where there was anything that had to be done with the inmates. They didn't have to... Other inmates didn't have to be moved. It was the rec yard. I think that... I think it does depend on what the response is, but it's also what is a reasonable response. I think that the canceling visitation for the six-hour period, yes, that was a reasonable response. Canceling attorney-client visits for a six-hour period, that was a reasonable response. But these are not unusual things that happen in an institution. Those kinds of things happen all the time. You describe it as run-of-the-mill. Yes. What's run-of-the-mill about a six-hour standoff? Well, because this is what I would say to that is, Your Honor, there's so little case law on this, but this court in 1982 addressed a mutiny case, United States versus Bay, I think. I'm not sure. It's B-E-Y. I'm not sure if I'm pronouncing it right. And that was a case where inmates, they were... It's cited in my reply brief, but inmates were mopping, and one of them threw the mop water. They grabbed the mop. They broke it into pieces. They went into a cell. They were holding the mop handle sections as weapons. They ended up assaulting two of the officers hitting them. Would it be different if the lockdown were 12 hours instead of six? Well, I think we'd have to look at how reasonable it was. I mean, if they were on the roof for 12 hours. But can I just finish one thing about Bay? Is that the court said this was not merely a refusal to follow orders. And they specifically said if the inmates had merely refused to leave their cell and they refused to turn over the mop, that would not be a mutiny. That's what they said. It's not just not following orders. It's not just disciplinary issues. It has to be more than that. And in that case, it was, they threatened, they had to be dragged out of their cells, two officers were assaulted, and that was enough to be a mutiny. So in that case, they said, we're not really sure what mutiny is. Because in 1982, they said there's not a lot of case law defining what mutiny is. And there's been almost none since then. But that's what makes me think that this was just barely a mutiny, Your Honor. I mean, if they had done less, if they had, you know, just been up there for an hour and said, okay, we're coming down now, and services were interrupted for an hour or three hours, even the six hours, if they had just voluntarily come down, I'm not sure that would have been a mutiny. That might have just been a disciplinary issue based on Bay. So that's why I call it a plain vanilla mutiny. Bay was a mutiny, it was much worse. It was violence, it was threatened violence, and it was actual violence. But in Bay, you had individuals refusing to come out of a place where they're supposed to be. Here, you have six individuals going someplace they're not supposed to be, and refusing to come down, refusing to cause disruption by throwing themselves off the roof, if anyone even approached, in view of the entire population, because it's the rec yard. So how is that not more of a disruption than Bay, where it was contained to a cell, even though that potential violence? Well, I'm not sure they were where they were supposed to be. They were in a cell, but I don't think it was their cell. I think they were a cleanup. I mean, they had a mop, and they threw the mop water and broke up the mop. So I'm not sure. They were indoors, but I'm not sure they were exactly where they were supposed to be. If they're supposed to be cleaning the cell, are they not supposed to be there? Well, yes, but I don't think they were supposed to stay there. I think they were supposed to get out when the guards told them to get out. But I understand your point. This was a much more visible, I mean, that was their point. They were trying to make a visible protest. They wanted attention. Yes, they did. But I still think it's very different than inmates who were, I mean, basically in Bay, it didn't rise to the level of a riot, I guess, but they were fomenting violence is what they were doing in Bay, and here they weren't. Well, were they fomenting non-compliance with orders? This is one thing that I don't think is disputed. They were not encouraging anyone to join them. By doing this, were they not showing that they could, and therefore that others could too? Possibly, but I think it's more along the nature of a hunger strike, for instance, which would not rise to the level of a mutiny. A hunger strike is something you do to get attention. It's something you do to draw media attention and other attention to your cause or your situation. It is certainly causing a risk of death or serious bodily injury because you could die if you're on a hunger strike, but there's no hunger strike that's ever been prosecuted as a mutiny, and I don't think it could be. So I agree with your description of it, but I don't think those are the factors that make it a mutiny. So do we have to wait for, does a prison administrator have to wait for violence or injury or destruction before calling a disruption major? Is that what the guidelines require? No. I mean, the prison or the facility did what they needed to do to get them down. I mean, they got their SWAT team out there and got them down. There was no damage to anything. I mean, I don't think, I mean... You would agree that detention facilities cannot operate normally during a rooftop stand-up. Yes, definitely agree with that. I don't disagree that there was a disruption. There was a disruption. So we're only quibbling over the adjective major. Yes. Yes. Exactly. Because there are three levels. I mean, what is that level 10? That level 10 isn't for completely, you know, legal conduct. I mean, the level 10 is for a crime, a federal crime, which is a mutiny. That's what the level 10 is for, but it is for, and I think that any mutiny, I can't imagine any mutiny not causing a disruption because that's the nature of a mutiny. I mean, it's got to cause a response. There's got to be some disruption. So that level 10 is for the lowest level of disruption, basically. But wasn't this a situation that called for a response? Yes. You had two separate teams called in, two, not just one, two separate teams called in to deal with the disruption. True. I mean, the first was like a negotiation team and the second was a SWAT team. So they went in levels appropriately. Yes. Is there not a possibility for violence with the SWAT team coming in or bodily injury depending on what they faced? Well, I mean, there was bodily injury to the defendants when the SWAT team responded, but that's not, I just don't think bodily injury to the defendants is what the guideline is about. But what we're really, I mean, this is, I guess what I'm saying is, I think the major disruption part is about what actually resulted, not what could have resulted. The violence part, the 22 level is about risk of, but that's not what this appeal is about because the judge didn't go there. But I think the major disruption is a result oriented, sort of like the, you know, when there's upward adjustments because the death resulted. The results here were that the six hour lockdown affected visitation. Yes. Affected attorney access and activities and recreation and dining. And meals. Yes. Yes, it did. I just don't know how much less of a disruption you could get I mean, what else, what other kind of mutiny is going to be a level 10 if not this kind of mutiny? That's what I'm saying. It's the lowest level. But I think my time is up. Yes, you've saved time for about. Yes. Thank you, Mr. Payne. May it please the court, William Payne for the United States. Both sides here agree that there was a disruption, even in the words of my colleague on the other side, a not insignificant disruption. And under clear error review, Arietta cannot meet his burden to establish that the district court clearly erred in determining that his offense to which he pleaded guilty involved a major disruption to the operation of the institution. And clear error is the appropriate standard, correct? Well, your honor, the United States would urge you to look at page 367 of the record where my colleague on the other side described this as a not insignificant disruption and said that next to the lowest base offense level, that this was the next most appropriate level and consider whether that was waiver or invited error. But even if you don't agree that it's waiver or invited error, we think Arietta is not entitled to relief under any standard of review because this would be a factual question reviewed for clear error. And the facts here established by the district court are very clear that this is no sit-in or run-of-the-mill mutiny. We're talking about organizing a large group of detainees to create a distraction and then riling them up as they pursue further mayhem and property destruction inside the barracks. You have them donning masks, climbing to the top of the two-story canopy, threatening to hurl themselves off of it if approached, where facility staff and law enforcement have to drag out mattresses in case they're going to try to hurt themselves. You have them disobeying orders of escalating levels of facility staff and law enforcement. You have the two specialized teams called in, not just the crisis negotiation team, but eventually the team that was forced to use chemical munitions and inert rounds to try to get them down. You have the six-hour lockdown that Agent Martinez testified as being... Is every facility lockdown a major disruption? Well, we would argue that that's going to be a fact-specific determination based off every individual disruption dependent on each individual institution. Here, we have testimony that the lockdown was unusual in length and severity, but again, that's going to depend on the specific factual predicate of any case. If you look at the Doyle case out of the Fourth Circuit, you're dealing with a situation in a maximum security correctional facility. Here, we're dealing with an immigration detention facility in El Paso on the border next to an international airport, and so that's just going to be a very different... You're going to have different facilities with different protocols responding to different incidents. So we think, again, that's going to be a very fact-intensive determination. What would separate a routine security response from a major institutional disruption? Well, again, Your Honor, I think in this case, we have a number of factors that we can point to. The ones that we were just going through, the calling of multiple different outside law enforcement teams. You have the calling of fire and EMS. You have the use of the rounds, and I think if you look at what cases in other circuits have considered what constitutes a major disruption, if you look at the Kramer case out of the Eleventh Circuit, it's the fact that they're calling in outside law enforcement is what they determine are the facts relevant to making that a major disruption and not a run-of-the-mill mutiny. Can you give me a concrete example of a mutiny or a protest that would remain level 10 instead of 16? Well, Your Honor, based on the facts of the record here and this specific facility in question, it certainly wouldn't be one in which you're pre-organizing a larger group of detainees that's going to go out and cause this mayhem and property disruption. It's not going to be one in which... But what would it be? I know something short of this in terms of duration and scope and et cetera, but... Your Honor, the only reason I hesitate is just because, again, I think it's such a fact-intensive determination and there's only so much in the record in terms of what the specific policies of the facility were, what the judgments made by the individual facility staff and law enforcement on site were. I'm just trying to avoid turning every vanilla run-of-the-mill mutiny that causes institutional inconvenience into a major disruption. I certainly understand the concern, Your Honor. I would caution you that you don't have to necessarily decide a hard and fast universal rule here that addresses that concern. You can decide this case solely based off of the numerous aggravating factors before the court today. Indeed, I think if you just look at the language used by the sentencing guidelines of this term, major disruption, a commonly used, commonly understood term, that necessarily, much as it does in many other contexts in the sentencing guidelines and in criminal statutes generally, invites a particular fact-intensive determination. That might be one in which my colleague on the other side has her preferred view of the facts. Understandably, and even this court might have a different evaluation of the exact nature of the facts here, but we are on clear error review. And on clear error review, this isn't a question of, you know, did the district court give even the best reading of the facts, even though we think it certainly did. The question is simply whether, you know, in choosing amongst plausible readings of the facts, did the district court clearly err? The guidelines talk about disruption to the operation of an institution. What is the relevant institution here? Is it the entire facility? Is it a unit of that facility? Is it a detention center's security operation? Or is it something else? I want to make sure I give a careful answer to your question, Your Honor. I think if we look at other case law, interpreting this guideline out of other circuits, you have situations in which a disruption, even in a very small portion of a facility, is treated as a major disruption. So this is one in which, even if you're able to geographically or unit-wise contain the disruption, it can still be a major disruption to the operation of the institution. So again, I think that that is going to be a flexible, fact-intensive determination based on any individual case. One thing that I'd like to draw the court's attention to here is also the question that my colleague on the other side brought up in terms of objective versus of subjective standard. And I just think it's important that we emphasize that this is not a question of intent. And so this isn't a matter of whether this was a civically-minded, peacefully-intended protest, although we think that the factual record here certainly demonstrates that there was an intent to cause a major disruption. But that's not the language at issue in the guideline here. It is whether the disruption that he pleaded guilty to involved a major disruption to the institution. And so again, I think that not only goes to the specific nature of the guideline in terms of this being an objective standard, but also calls into question that it's going to necessarily involve a factually-intensive question of whether the facility staff and law enforcement present responded in the way was deemed necessary to the individual disruption. So the fact that this resulted in something like a six-hour lockdown that was more intense and more lengthy than ordinary is a reflection not necessarily of intent, but of objective result. And that's what the court is looking at here. I draw the court's attention to the Kramer case in that that's a case in which the defendants there didn't aim to create any sort of disruption. If anything, they wanted to get away scot-free and not get noticed. But certainly their crash of a helicopter did create a major disruption there. Also in terms of this being a question reviewed for factual clear error, assuming that this court doesn't decide that there's waiver or invited error, I'd also point you to those other cases that are cited in both my colleague on the other side's brief as well as ours where the Fourth Circuit in Doyle says that they're analyzing for clear error there and that it's a factually-intensive question. And the Eleventh Circuit in Kramer, too, is drawn towards the factual question there. So again, that's an issue of clear error. And clear error requires a definite and firm conviction that a mistake has been made below. And it's the burden of my colleague on the other side to make that showing. I'd also like to address quickly the issue of mutiny versus riot here. I know there's been some back and forth here about what constituted that. I know, Judge Ramirez, you brought up the Bay case. But I'd just like to emphasize in my time remaining that this isn't a question that turns on whether this was a riot or a mutiny. I'm happy to delve into the specifics of that if the court likes. But fundamentally, this is a question involving the application of the guideline. And the guideline and the criminal statute use those to apply the same standard to both riot and or mutiny. And this is certainly a case in which we have a major disruption. So I don't think that this court needs to delve into that question, which it's acknowledged that there's not necessarily a lot of guidance. But that is not what's at issue here. It's an issue of major disruption to the operation of the institution. And there's not a single fact that you isolate as most clearly moving this case from ordinary mutiny to major disruption. In the government's view, correct me if I'm wrong, it's just this unique collection of facts. Not a single fact in isolation, but the aggregate? I think some of them might be powerful enough on their own. For example, the calling in of two different law enforcement teams to move it into the category of major disruption in and of itself. What we're saying is that there's a plethora of facts established in the district court record to reach that conclusion. And again, to your question earlier, Judge Willett, in terms of this court correctly interpreting the guideline, but making sure that this is responsive to the particular individual cases that this court or the district courts might face, these are going to be very, very factually intensive inquiries that are really going to depend on the facets of every specific disruption and every specific institution in future cases. So again, the fact that there are a lot of factual factors at play here, is going to be a potentially recurring issue where it's not one where this court is necessarily going to be in a position to say, in all cases, this is going to be exactly what's going to constitute a major disruption or not. This isn't one where the guidelines lay out specific factors, it's where it lays out the standard of major disruption. And here we have a lot of factual findings below, which we think clearly move it into the category of major disruption. And if there are no remaining questions from the court, I'm happy to return my time and urge this court to affirm. Thank you. Mr. Payne is stilling for a vote. I guess I should start by addressing the standard review, and I understand your question now, which is, did I invite error? Did I somehow agree that the major disruption, because I did say in the alternative, I argued for the level 10 and said in the alternative, the disruption upward adjustment would be more appropriate than the violence adjustment. I don't think that I did, because I made it very clear that I thought the level 10 was appropriate. I did not argue why the disruption should apply. I did concede there was a disruption, and I never said that I agreed it was a major disruption. I just said, go to the lesser bad thing, if you won't go all the way to what I'm asking for. I don't think that asking for a lesser sanction is an agreement to a sanction when you're asking for basically no upward adjustment. But, and I want to speak just a minute. I'm not saying that my client's protest was necessarily civic-minded. I'm not saying that it was necessarily that. But it wasn't for a terrible purpose. They wanted to be deported. It was not a protest against law enforcement, against law and order, really. I mean, it was against the rules. It was causing a problem there, but they wanted to be deported. They didn't want to be held here anymore. The pre-organization, again, all the things that went into this, those are not relevant. Those go to their intent. They do not go to the severity of the disruption. The severity of the disruption, I think it's sort of analogous to the severity of an injury in an assault case, because you have injury, and then you have serious bodily injury. Where do you draw that line? They're always going to be fact-specific, but things that you look at are like lasting effects. Was it a slap to the face that hurt for a little bit, or was it a broken bone? Those are the kinds of things that you look at, and I think those are analogous to the things you would look at as far as a disruption. The Kramer case, I think, is instructive. Now, that was an escape attempt, and it was not actually a mutiny case, but it was a helicopter going into a prison yard and getting caught up on the concertina wire when it was leaving. It broke the concertina wire. The helicopter crashed. I mean, you can imagine they had to bring in, there were serious injuries. They had to bring in EMS. They had to take the helicopter out of there. There's all sorts of things that went into that. And in that case, actually, the trial court had just said, they gave a three-level upward departure because it was the escape guideline. It wasn't actually the mutiny guideline, but they said, we think there ought to be some upward adjustment because of the disruption, and the trial court assessed a three-level upward departure based on that kind of disturbance, which seems pretty significant to me. The Doyle case, which is the unpublished case for the Fourth Circuit, we have so little to go on for examples here, but the Doyle case, again, the inmates were starting fires. The institution became filled with smoke. The entire, I don't know if it was just the wing or the whole thing, had to be evacuated. All these inmates had to be moved out of cells and put somewhere else. There was smoke, risks of fires. Those are clearly much more significant disruptions than what we had here. I know we've talked, it's about a six-hour delay or lockdown, but the incident itself, I think, was just a little over three hours that it lasted. Anyway, I think that what is most significant to me here is the judge made no findings, and there were no arguments for disruption, so we don't even have implied findings. And I mean arguments in the district court, there were no arguments for it because they were trying to get the 22-level upward adjustment for the risk of serious bodily injury or death, which is a completely different analysis. It's not, that one is not result-oriented, it's intent or possibility-oriented. So we can't even think of any implied findings that the court made by saying, I agree with the arguments on this side. There were no arguments that suggested a maze-insured disruption. Yes, ma'am. Is the reason that there were no arguments, maybe in part because of your statement that you had attended the sentencings of other co-defendants who had been sentenced to, or had a level 16 assessed, and that you understood that that would probably happen in this case for the very same reasons because the conduct was the same. And so you knew what those reasons were, the court knew what those reasons were, the prosecutor knew what those reasons were in the other cases. You all know what you were talking about, just nobody put it into the record. So quite honestly, Your Honor, and I didn't actually attend the other sentencings, I knew about them, I'd heard about them, because it's a small town. But I don't know, honestly, I don't know if other defendants had even asked for the level 10, to be quite honest, I don't know. I do know that, yes, there is an aspect of this. I didn't want to waste the court's time because I knew what the very likely outcome was. So yes, this was a very abbreviated sentencing based on that. Yes. All right, thank you, Ms. Dillon. Your case is under submission. Thank you. And we noticed that your court appointed under the CJA, and we wish to express our thanks for your willingness to take the appointment, and for your good work on behalf of your client. Thank you, Your Honor.